UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------x

 UNITED STATES OF AMERICA,

                                          **MEMORANDUM & ORDER**
                 -against-                   21-CR-398(EK)

 RONDELLE ESTERS,

                      Defendant.

------------------------------------x
ERIC KOMITEE, United States District Judge:

          Defendant Rondelle Esters is charged with violating

the felon-in-possession statute, 18 U.S.C. § 922(g).  He argues

that New York City Police Department personnel discovered the

gun only after they violated the Fourth Amendment by taking him

into custody based on an "I-Card" — an internal NYPD notice —

and conducting an inventory search of the car he was driving.

On that basis, he moves to suppress the firearm recovered from

the glove compartment of the car.  Def. Mem. in Supp. of Mot. to

Suppress ("Def. Mem.") 2, ECF No. 29.  For the reasons set forth

below, the motion is denied.

                  **I.    Factual Background**

          The following facts are based on testimony at the

suppression hearing and documentary evidence received there,

unless otherwise noted.[1]   Detective Janet Dorta, the detective

who investigated the domestic violence incident, was the sole

witness at the hearing.  *See* Tr. of Aug. 5, 2022 Supp. Hr'g

("Tr."), ECF No. 63.

## A.    June 22, 2020 Domestic Violence Incident

On June 22, 2020, two unidentified females called 911

to report a domestic disturbance.  *See* Gov't Ex. 2, at 8/62-

9/62.[2]  The government introduced an "ICAD Log" form that,

Detective Dorta explained, is a record of the "911 operator

typing in what's being told to them as the call is coming in."

Tr. 112:10-11.  The log entry reflects two 911 calls: one from a

female caller who stated that her "child[']s father assaulted

her" and she had been "pepper sprayed"; and one from another

caller who stated that her "daughter [was] fighting child[']s

father" and "someone sprayed [her] with pepper spray."  Gov't

Ex. 2, at 8/62; *see also* Tr. 113:7-9, 115:1-12, 115:6-13.

Officer Oscar Palomino was among the officers who

responded to the disturbance.  At the suppression hearing,

---

[1] Esters submitted the I-Card, body camera footage of the traffic stop, and body camera footage of the inventory search with his motion to suppress, but did not offer the materials into evidence at the suppression hearing.

[2] All page numbers in citations to exhibits that the parties entered into evidence at the suppression hearing use internal pagination where available.  For example, Gov't Ex. 2 has an internal pagination of "X/62" in the lower right corner of each page.  For exhibits that have no page numbers, such as Gov't Ex. 6, the Court uses the .pdf page number of the exhibit. Page numbers to other record documents (except the hearing transcript) and briefs use ECF pagination.

defense counsel played Officer Palomino's body-camera footage. *See* Gov't Ex. 7, Footage from Body Camera of Officer Palomino on June 22, 2020.  The government also submitted body camera footage from two other officers at the scene.  Gov't Exs. 8-9; Tr. 75:25-76:18.

Officer Palomino spoke with the alleged victim (hereinafter the Complaining Victim, or "CV"), who is the mother of one of Esters' children.  The video footage shows Palomino taking notes while speaking with the CV.  Gov't Ex. 7, at 7:54-12:48; *see also* Gov't Ex. 3, Domestic Incident Report dated June 22, 2020.  The CV tells Palomino that Esters "came inside my mom's house . . . I don't know how he got in."  Gov't Ex. 7, at 7:58-8:03.  Palomino asks what happened after Esters entered; she responds that "he was hitting me, beating me, and whatever the case may be."  *Id.* at 8:09-8:16.  Palomino asked the CV when Esters "start[ed] using the pepper spray"; she responded that she didn't "know when it happened."[3]  *Id.* at 8:35-8:41.

Officer Palomino then hands a Domestic Incident Report form to the CV, and asks her to fill out the "Statement of Allegations" section.  *Id.* at 9:21-9:29.  The CV wrote: "I was in the back room with my kid [name redacted] and her father came

---

[3] Most of the evidence names "pepper spray" as the irritant used in the June 2020 incident, but the word "mace" appears in the record as well.  This order uses those terms alternatively, depending on what the source to which I am referring said.

and was fighting me.  Pepper-spray me."  Gov't Ex. 3, at 2.
Palomino's body-camera footage shows, however, that the CV did
not initially include this last sentence — "Pepper-spray me."
After the CV initially handed the form back to Palomino, he
reviewed it and gave it back to her, adding "just, you say
[that] he pepper spray[ed] you or . . . somebody spray[ed] you."
Gov't Ex. 7, at 11:50-12:24.  After she made the requested
addition, Palomino asked her to sign the statement, which she
did.  *Id.* at 12:40-12:46.  The sentence "False statements made
herein are punishable as a Class A Misdemeanor, pursuant to
Section 210.45 of the Penal Law[]" is written in bold typeface
right above the line where the CV signed.  Gov't Ex. 3, at 2;
*see also id.* (noting that "Officers are encouraged to assist the
Victim in completing this section of the form").

        Palomino and the others officers continued to
investigate who discharged the pepper spray.  Sanchez-Escobar is
seen pointing at the CV's sister and telling Palomino, "she saw
the mace being used."  Gov't Ex. 7, at 13:10-13:20.  Sanchez-
Escobar then asked her, "Did you see [Esters] use pepper spray?"
Gov't Ex. 9, at 11:36-11:41.  The CV's sister replies: "Yes."
*Id.*

        In the section of the Domestic Incident Report calling
for a brief description of the "circumstances of this incident,"
Palomino wrote that Esters "did enter [the] apartment and began

punching" the CV "without provocation and did use a pepper spray toward" her.  Gov't Ex. 3, at 1.  Officer Palomino checked "Yes" where the Domestic Incident Report asks whether an offense was committed, and further indicated that the offense was "Ass. 3" (assault in the third degree).  *Id.*; *see also* Tr. 40:12-14.

Following the filing of the Domestic Incident Report, Officer Palomino prepared a complaint in the NYPD system.  *See* Gov't Ex. 1, Complaint.  He wrote that an assault was completed and that the "most serious offense is: misdemeanor."  *Id.*

## B.  Detective Dorta Begins to Investigate

The day after the incident, the NYPD assigned Detective Dorta to the case.  Dorta testified that she has worked at the NYPD for sixteen years, and as a detective since 2017.  Tr. 28:17-22.  She has experience with domestic violence cases.  *Id.* at 28:23-25.  Dorta reviewed the Complaint, Domestic Incident Report, the log of the two 911 calls, and the body-camera footage.  *See id.* at 30:1-4, 33:4-13, 35:4-6, 64:1-18, 112:4-6, 83:18-22, 106:10-14.  Dorta also checked the NYPD system for prior domestic incident reports involving Esters and the CV and discovered two from 2019, which she made part of her file.  Gov't Ex. 2, at 23/62; *see also* Tr. 47:22-48:17.

One such report is dated October 29, 2019, and describes an incident from that same day.  The responding officer described the CV's "emotional condition" as "[u]pset"

5

and "[a]ngry."  Gov't Ex. 4, at 2.  The "Incident Narrative"
records the following:

> [The CV] states that she was at her mother['s] house
> when [Esters] came into [the] location and had an
> altercation w[ith] [her].  [The CV] stated [Esters]
> grabbed her by her hair and hit her head a couple of
> times.  [The CV] states she left her mother['s] house
> and came to Manhattan [because] she felt [Esters] was
> [following] her and her little girl. . . . [The CV]
> states [Esters] broke her phone during [the] dispute.

*Id.*  The same report notes that the CV reported "prior DV
[domestic violence] incidents" with Esters, although no order of
protection was in effect, *see id.*, and that the physical
violence in the relationship had increased in frequency or
severity over the past six months.  *Id.* at 3.  The second report
indicates that Esters and the CV had a "verbal dispute" on
November 30, 2019, but Esters, rather than the CV, is recorded
as the complaining victim on this report.  Gov't Ex. 5, at 1-2.

Following these steps, Detective Dorta issued what the
NYPD calls an "I-Card."[4]  *See* Gov't Ex. 2, at 29/62 ("Activate
Investigation Card"); Def. Mem. Ex. B (the I-Card); *see also* Tr.
58:9-12 (Dorta testified that the October 2019 report

---

[4] I-Cards are "an internal NYPD form issued by an officer when there is
a suspect, witness, or perpetrator to be investigated." *Johnson v. City of
New York*, No. 15-CV-1625, 2017 WL 1476139, at *2 (E.D.N.Y. Apr. 24, 2017)
(Gold, M.J.).  There are two types of I-Cards: a "probable cause" I-Card and
a "suspect only" I-Card.  *United States v. Fleming*, No. 18-CR-197, 2019 WL
486073, at *2 (E.D.N.Y. Feb. 6, 2019).  "Probable cause [I-Cards] signal that
there is probable cause for a person's arrest, whereas suspect only [I-Cards]
show that the subject . . . is a person of interest."  *Id.*  The I-Card at
issue here was of the "probable cause" type.

"solidified the fact that the I-card was needed").  The I-Card lists Dorta as the submitting officer and states that there was "probable cause to arrest" Esters for "ASSAULT - 2ND DEGREE." Def. Mem. Ex. B.  Dorta's citation to second-degree assault — a felony — diverged from Palomino's report, which (as noted above) invoked third-degree assault (a misdemeanor).[5]

## C.   Dorta's Interview of the CV

Detective Dorta spoke with the CV by phone on June 23 — that same day, but after she had issued the I-Card.  Tr. 122:1-6; *see* Gov't Ex. 2, at 33/62 (Summary of Investigation). Dorta quotes the CV as stating that Esters walked through the open front door of her apartment, following which they "started arguing cause I don't wanna be in a relationship with him anymore . . . . We start[ed] tussling back and forth."  Gov't Ex. 2, at 33/62.  The summary records that the CV declined to ascribe the use of the pepper spray (or "mace") to Esters: "I went to back up.  Once I stepped back I opened my eyes but I

---

[5] A person commits second-degree assault when he intentionally causes physical injury "by means of a deadly weapon or a dangerous instrument." N.Y. Penal Law § 120.05(2).  Under New York law, fists do not generally qualify as a deadly weapon or dangerous instrument in this context. *See People v. Nealy*, 681 N.Y.S.2d 33, 34 (App. Div. 2d Dep't 1998).  Whether pepper spray so qualifies appears to be an open question. *People v. Sandel*, 84 N.Y.S.3d 340, 343 (N.Y. Sup. Ct. 2018) (noting that "there appears to be no appellate authority in New York addressing whether a noxious chemical spray . . . constitutes a dangerous instrument").  Dorta acknowledged this uncertainty at the hearing: asked whether, if she "were to issue the I-Card today, it would be for an assault in the third degree," she answered "Correct." Tr. 108:24-109:2.  Dorta could not remember precisely when she learned that pepper spray did not necessarily warrant second-degree assault charges, though it was after she issued the I-Card. *Id.* at 110:21-23. Whenever she did, however, she did not update the I-Card. *Id.* at 110:14-16.

couldn't see.  My eyes were irritated I really don't know where the mace came from.  At this point he's standing in front of me, I guess he was trying to cover [himself]."  *Id.*

**D.    Post-June 23, 2020 Investigation**

Weeks later, NYPD Domestic Violence Officer Robert Hunter also investigated the domestic violence incident.  *See* Gov't Ex. 6.  Detective Dorta testified that detectives like her "basically work hand-in-hand with the [NYPD's] domestic violence officers."  Tr. 46:19-23.  Hunter spoke with the CV twice.  The first interview occurred on July 30, 2020, more than five weeks after the CV signed the Domestic Incident Report and Detective Dorta issued the I-Card.  Gov't Ex. 6, at 15.

In Hunter's report of that phone interview, he wrote that the CV "[s]tates incident did not occur how it was reported" and that she "still sees offender from time to time." *Id.*  Hunter also recorded that the CV "was very short spoken, and not forthcoming with" him.  *Id.*  Officer Hunter had another phone conversation with the CV on September 17, 2020.  *Id.* at 16.  His summary of that contact noted that the CV "still has contact with offender and [the CV] was unaware that he is wanted."  *Id.*  A January 6, 2021 notation in Hunter's file indicates that he attempted to apprehend the defendant, but was unsuccessful because the defendant was not at the chosen location.  *Id.* at 19.

Detective Dorta testified that Officer Hunter relayed the content of his two conversations with the CV to her.  Tr. 86:20-87:1.  Dorta did not update the I-Card following these conversations.  *Id.* at 87:6-8; 110:9-16.

**E.   Esters' March 16, 2021 Arrest**

About eight months after the June 2020 incident, on March 16, 2021, three NYPD officers and a Sergeant — Mark Xylas — witnessed Esters run a red light in Brooklyn in a Jeep Grand Cherokee.  Traffic Stop Video, Def. Mem. Ex. A, ECF No. 36.  The officers initiated a traffic stop.

As Sergeant Xylas approached the vehicle, Esters told him that he was "on the phone with my parole officer . . . I'm going around the corner to meet my P.O."  *Id.* at 1:06-1:12. Esters asked why he was being pulled over; Xylas responded that he "ran the light on Marcy [Avenue]."  *Id.* at 1:20-1:28.  After Sergeant Xylas asked Esters for identification, one of the officers ran a check and learned of the active I-Card.  *Id.* at 1:23.  The officer shared this information with Xylas, who was in conversation with Esters and his parole officer (via speaker phone).  *See id.* at 1:43-2:48, 6:45.  Xylas asked Esters about the alleged domestic violence episode and the I-Card.  Esters confirmed his involvement in a "discrepancy" with his former partner, but disputed her version of events.  *Id.* at 4:51-7:00, 11:10-11:38.

Xylas then called the 79th Precinct; he told the duty officer that he was following up on Esters' "active I-Card" for "some DV assault." *Id.* at 7:30-9:37.  Following the precinct's response, Xylas placed another call and spoke with an Officer Diaz.  *See id.* at 9:58-10:50.  He asked Diaz if "Dorta [is] working," but was unable to reach her.  *Id.*

The police took Esters into custody and transported him to the 79th Precinct.  Police brought the vehicle, which Esters said he borrowed from his girlfriend, to the precinct. An officer then conducted an inventory search of the vehicle. *See* Inventory Search Video, Def. Mem. Ex. C, ECF No. 36.  Body-camera footage shows that officer using a flashlight to search the interior of the vehicle.  *Id.* at 0:34-2:00.  The officer opened the glove compartment using Esters' car keys; inside was a loaded .357 Magnum revolver.  *Id.* at 2:01-4:53.

Esters was indicted for possessing a firearm and ammunition after having been convicted of a felony.  Indictment, ECF No. 1.  He now moves to suppress the firearm recovered from the vehicle, on the basis that the officers did not have probable cause to arrest him.  Def. Mem. 2.  Esters also seeks to suppress "any post-arrest statements" he made during the interrogation that followed, contending that the interrogation would not have occurred absent the improper arrest.

10

## II.  Discussion

For the reasons explained below, Esters' motion to suppress is denied.  His arrest was based on an active I-Card, which was supported by probable cause.  Moreover, even if the arrest for assault was inconsistent with the Fourth Amendment, the officers had probable cause to arrest Esters for a traffic violation.

### A.  Warrantless Arrests

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  Thus, "the ultimate measure of the constitutionality of a government search or seizure is reasonableness."  *United States v. Bailey*, 743 F.3d 322, 331 (2d Cir. 2014).[6]  "[T]he arrest of a person is quintessentially a seizure." *Torres v. Madrid*, 141 S. Ct. 989, 996 (2021).  Warrantless arrests are generally "reasonable under the Fourth Amendment" only when "there is probable cause to believe that a criminal offense has been or is being committed." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004).

---

[6] Unless otherwise noted, when quoting judicial decisions this order accepts all alterations and omits all citations, footnotes, and internal quotation marks.

**B.     The I-Card Was Predicated On Probable Cause When Issued**

Esters argues that the issuance of the I-Card was not supported by probable cause.  Def. Reply Mem. in Supp. of Mot. ("Def. Reply Mem.") 2-5, ECF No. 43.

"Probable cause requires an officer to have knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested."  *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006).  Generally speaking, probable cause is a low bar, requiring only a "fair probability" that a crime has been or is being committed; it does not mean more likely than not.  *E.g.*, *Illinois v. Gates*, 462 U.S. 213, 238 (1983).

The CV alleged that Esters assaulted her.  She made this claim in writing (in the Domestic Incident Report), *see* Gov't Ex. 3, at 2, and orally to Officer Palomino (as captured on video), *see* Gov't Ex. 7, at 7:54-8:41.  "Victims, in particular, are among the most reliable informants because they can provide a first-hand non-hearsay account of the criminal activity."  *Davenport v. City of New York*, No. 15-CV-5890, 2017 WL 4356883, at *7 (E.D.N.Y. Sept. 28, 2017).  The CV wrote that Esters had been "fighting" and "punching" her, and used pepper spray (though she was otherwise equivocal about who discharged the spray).  Gov't Ex. 3, at 1-2.  She stated — on video — that

12

Esters had been "beating" and "hitting" her.  Gov't Ex. 7, at
8:09-8:16.  And the CV's sister told officers at the scene —
also captured on video — that she saw Esters pepper spray the
CV.  Gov't Ex. 9, at 11:36-11:41.  Together, these statements
were sufficient to establish probable cause for Esters' arrest.
*See, e.g.*, *Weiner v. McKeefery*, 90 F. Supp. 3d 17, 29-31
(E.D.N.Y. 2015) (probable cause to arrest based on interview
statements by victim and sworn statements by eyewitness brother
made to officers responding to alleged child endangerment);
*Dowtin v. O'Neill*, No. 16-CV-6119, 2019 WL 7496574, at *2
(E.D.N.Y. Jan. 7, 2019) (probable cause to arrest based solely
on victim's complaint to NYPD of protection order violation).

Detective Dorta did not stop there.  She reviewed the
log entries summarizing the 911 calls about the incident, *see*
Gov't Ex. 2, at 8/62; pulled the prior Domestic Incident Reports
involving Esters and the CV, *id.* at 23/62; and reviewed the body
camera footage from the responding officers, *id.* at 28/62.
These materials — especially the October 2019 Domestic Incident
Report — provided further cause to issue the I-Card.  *See* Gov't
Ex. 4, at 2 (October 2019 report stated, among other things,
that Esters "grabbed [the CV] by her hair and hit her head a
couple of times").

**C.    Subsequent Events Prior to Esters' Arrest Did Not Vitiate the Probable Cause Underlying the I-Card**

Esters also argues that even if there was probable cause to support the I-Card when Dorta initiated it on June 23, 2020, that probable cause had dissipated by the time Esters was arrested in March 2021, in light of statements made by the CV after the I-Card's issuance.

"In order for probable cause to dissipate, the groundless nature of the charges must be made apparent by the discovery of some intervening fact." *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 571 (2d Cir. 1996), *as amended* (May 21, 1996).  Not every indication that a witness is wavering, however, will vitiate probable cause.  "Neither an arrestee's protestations of innocence nor a putative victim's inconsistent statements necessarily vitiate probable cause." *Fogelman v. Donato*, 111 F. Supp. 3d 282, 285 (E.D.N.Y. 2015). This principle holds "especially" true "in a domestic violence situation," where "stories conflict and recantations happen so frequently." *Torres v. City of New York*, No. 20-CV-4007, 2022 WL 955152, at *5 (E.D.N.Y. Mar. 30, 2022).

Esters argues that the CV's statements were unreliable because she described the circumstances of the alleged offense differently at different times.  Def. Reply Mem. 5.  On the day of the incident, the CV told Officer Palomino that Esters

14

entered her apartment and "started punching" her, and she wrote
(at Palomino's suggestion) that he pepper-sprayed her.  Gov't
Ex. 3, at 1.  Interviewed by Dorta a day later, however — after
the I-Card issued — the CV appeared to distribute blame for the
physical altercation more widely, *see* Gov't Ex. 2, at 33/62
(Dorta's written summary states that the CV and Esters
"start[ed] tussling back and forth"), and she denied knowing who
sprayed the irritant: "I really don't know where the mace came
from," *see id.*  Later, the CV told Officer Hunter (of the
Domestic Violence Unit) that the "incident did not occur how it
was reported."  Gov't Ex. 6, at 15.

        "[W]hile vastly inconsistent statements by a victim
might undermine the victim's reliability, minor inconsistent
statements do not automatically vitiate probable cause based
solely on a victim's statements if the totality of the
circumstances support probable cause."  *Davenport*, 2017 WL
4356883, at *11.  Here, the probable cause was not based solely
on the victim's statements, and her statements were not "vastly
inconsistent."  The CV alleged that Esters was physical with her
in both accounts, even if she apportioned some of the blame to
herself in the later statement about "tussling back and forth."
And the CV was always equivocal (at best) about who deployed the
pepper spray, even as her sister stated directly that it was
Esters.  The allegation concerning the pepper spray was not

necessary to establish probable cause when the I-Card issued; there was more than enough other evidence in Dorta's file.  And the CV's equivocation is not particularly surprising, considering the eye irritation that ensued after the spray was discharged.  *See Crawford v. City of New York*, 477 F. App'x 777, 779 (2d Cir. 2012) ("The supposed inconsistencies in some of the [victims'] statements as to the details and precise dates of the assaults are minor discrepancies that do not negate probable cause . . . .").

Moreover, any gap between the CV's June 22, 2020 statements and those that followed would be consistent with common experience in domestic violence cases.  "The courts in this Circuit, scientists, and commentators have repeatedly recognized the pressure on domestic violence victims to recant and protest their attackers' innocence and the unreliability of those recantations."  *Torres*, 2022 WL 955152, at *4; *see also United States v. Carthen*, 681 F.3d 94, 103 (2d Cir. 2012). Because of this "all too common dynamic," it is "entirely reasonable for [an officer] to credit [the victim's] contemporaneous statements rather than her after-the-fact version."  *Felix v. New York State Dep't of Corr. and Cmty. Supervision*, No. 16-CV-7978, 2018 WL 3542859, at *9 (S.D.N.Y. July 23, 2018).

Here, the circumstances help to explain why the CV's statements to Officer Hunter might indicate an effort to backtrack on her initial statements.  She told Hunter that she and Esters continued to see one another after the June 22, 2020 incident.  Gov't Ex. 6, at 15.  The CV and Esters had been in a relationship for ten years and share a young daughter.  *See* Gov't Ex. 2, at 33/62.  Given this, and the case law cited above, I conclude that the probable cause extant on June 23, 2020 had not dissipated by the time of Esters' arrest.

**D.   The Arresting Officers Properly Relied on the I-Card**

Probable cause to arrest may exist even if the arresting officers do not possess firsthand knowledge of the suspect's alleged criminal activity.  Under the collective knowledge doctrine, "an arrest or search is permissible where the actual arresting or searching officer lacks the specific information to form the basis for probable cause or reasonable suspicion but sufficient information to justify the arrest or search was known by other law enforcement officials initiating or involved with the investigation."  *United States v. Colon*, 250 F.3d 130, 135 (2d Cir. 2001); *see Martinez v. Simonetti*, 202 F.3d 625, 634 (2d Cir. 2000) ("Police officers, when making a probable cause determination, are entitled . . . to rely on the allegations of fellow police officers.").

District courts in this Circuit have frequently applied the collective knowledge doctrine to arrests based on an I-Card.  *See, e.g., Watkins v. Ruscitto*, No. 14-CV-7504, 2016 WL 3748498, at *6–7 (S.D.N.Y. July 11, 2016) (Peck, M.J.) (arresting officers were entitled to rely on the probable cause determination of the officer who issued the I-Card); *Dowtin*, 2019 WL 7496574, at *2 ("Any knowledge held by the officer who took that complaint is imputed to Defendant (via the I-Card) as a matter of law.").[7]

Esters argues that because the I-Card does not include a detailed description of the allegations — including complainant or witness statements, references to police reports, domestic incident reports, or 911 calls — it fails to state the basis for probable cause.  Def. Mem. 7.  Esters provides neither a logical reason nor caselaw explaining why the I-Card itself would need to do so, given the collective knowledge doctrine outlined above.  Under settled law, officers "do not need to independently determine that probable cause exists as long as

---

[7] Esters also contends that *United States v. Dudley* stands for the proposition that the collective knowledge doctrine is not applicable to I-Cards, Def. Mem. 7-8, but that is incorrect.  In *Dudley*, the district court concluded that it was "appropriate" for an arresting officer to rely on an I-Card in effectuating an arrest, but concluded that the original issuance of the I-Card was not supported by probable cause.  *See United States v. Dudley*, No. 18-CR-670 (E.D.N.Y. May 8, 2020), ECF No. 49 at 8, *R. & R. adopted* (Dec. 3, 2020).

the officer ordering the arrest possesses sufficient probable cause to direct it."  *Watkins*, 2016 WL 3748498, at *6.[8]

**E.    The Classification of Esters' Conduct as Second- or Third-Degree Assault is Irrelevant**

At common law, officers were generally permitted to effectuate a warrantless *felony* arrest based on second- (or third-) hand information, but permitted to arrest a misdemeanant without a warrant only for a misdemeanor committed in the officers' presence.  *See, e.g.*, *Carroll v. United States*, 267 U.S. 132, 156-57 (1925) (describing this as the "usual" common law rule).  *But see Graves v. Mahoning Cnty.*, 821 F.3d 772, 779 (6th Cir. 2016)(noting that some common-law sources allowed officers to "arrest without a warrant for 'some misdemeanors' committed outside their presence" (citing 2 Matthew Hale, Pleas of the Crown 88-89 (1736); 2 William Hawkins & John Curwood, Treatise of Pleas of the Crown 120-22, 132 (8th ed. 1824))).  If this common-law rule applies here, it would be because the

---

[8] Though no further diligence was due, Sergeant Xylas conducted some anyway.  The body-camera footage makes clear that Xylas has collected additional facts because he refers to information that is not contained in the I-Card itself.  For example, Xylas is heard referring to the CV by name, despite the fact that her name is not on the I-Card, and asking Esters if he's "good with her."  Def. Mem. Ex. A, at 4:59-5:03; *see also* Def. Mem. Ex. B (I-Card does not contain CV's name).  The I-Card does note the number for the Complaint, states that a domestic violence incident spurred its issuance, and lists the defendant's arrest history.  *See* Def. Mem. Ex. B.  In the traffic stop video, Xylas appears to be looking at the Complaint, as well as the I-Card itself (indicated by the photo of Esters in the top-left of the document).  Def. Mem. Ex. A, at 7:51-8:23, 8:40, 9:07.  While on the phone to discuss the status of the I-Card, he told another officer that he was "looking him up right now and he actually has an active I-Card in the 79 . . . for assault 2.  Some DV assault 2."  *Id.* at 7:51-8:07.

Fourth Amendment's "reasonableness clause" — enshrining the "right of the people to be secure in their persons . . . against unreasonable searches and seizures" — incorporated the then-extant common-law rules. *See Graves*, 821 F.3d at 779 ("What was reasonable at common law often tells us what is reasonable under the Fourth Amendment.").

Esters invokes this felony-misdemeanor distinction to argue that the arrest based on the I-Card was improper, since the I-Card erroneously invoked second-degree assault (a felony) when it should have referenced third-degree assault (a misdemeanor). Def. Letter dated Aug. 29, 2022, at 9-14, ECF No. 67. This argument is predicated on the premise — itself unsettled — that pepper spray is not a "dangerous instrument" within the meaning of New York's second-degree assault statute. *See* note 5 *supra*.

The Supreme Court has not decided whether the "usual" common-law rule about warrantless misdemeanor arrests is constitutionally required. In *Maryland v. Pringle*, 540 U.S. 366, 370 (2003), the Court wrote that a "warrantless arrest of an individual in a public place for a felony, or a misdemeanor committed in the officer's presence, is consistent with the Fourth Amendment if the arrest is supported by probable cause." But in that case and others, the Court left open a related question: whether an officer can arrest an individual for a

20

misdemeanor committed outside his presence. *See Atwater v. City of Lago Vista*, 532 U.S. 318, 340 n.11 (2001) ("We need not, and thus do not, speculate whether the Fourth Amendment entails an 'in the presence' requirement for purposes of misdemeanor arrests.").[9]

The Second Circuit has not answered the question either, at least not explicitly; and no district court in this district appears to have, either.  The case that came closest may be *Fleming*, 2019 WL 486073.  There, the district court denied a motion to suppress evidence discovered during a misdemeanor arrest based on an I-Card.  *Id.* at *9.  Implicit in *Fleming's* holding is the notion that officers may, consistent with the Fourth Amendment, arrest a misdemeanant for a crime committed outside their presence, so long as the arrest is supported by probable cause.  But the *Fleming* court did not, apparently, need to contend with the argument Esters makes here.[10]

---

[9] Though *Atwater* did not decide the question, it gave a potential clue about its view by citing to Justice White's dissent in *Welsh v. Wisconsin*, 466 U.S. 740, 756 (1984), in which he observed that "the requirement that a misdemeanor must have occurred in the officer's presence to justify a warrantless arrest is not grounded in the Fourth Amendment."

[10] A neighboring district court did write that there are "only two grounds on which the police may arrest an individual if they do not have a warrant: (1) if the arresting officer has reasonable ground to believe that the individual has committed a felony, or (2) if the officer has probable cause to believe that an individual committed a misdemeanor in the officer's presence*." United States v. Awadallah*, 202 F. Supp. 2d 17, 45 (S.D.N.Y. 2002).  *Awadallah* cited *Atwater* for this proposition, but as noted above, the

I hold that the officers acted consistent with the Fourth Amendment in arresting Esters for assault based on the I-Card, even if there was only probable cause to arrest him for a misdemeanor.  Many Courts of Appeals have uniformly concluded that the Fourth Amendment does not prohibit warrantless arrests for misdemeanors committed outside the arresting officers' presence.  *See Graves*, 821 F.3d at 778-79 (citing decisions from the First, Fourth, Fifth, Seventh, and Ninth Circuits); *see also* 3 Wayne R. LaFave, *Search and Seizure* § 5.1(b) (6th ed. 2020) (observing that "lower courts have rather consistently concluded" the same).  The defense has proffered no case reaching the contrary conclusion — that is, holding that an officer violates the Fourth Amendment by arresting someone for a misdemeanor committed outside his or her presence.

There are sound reasons for adopting this approach. While the courts generally have not explained their readings of the Fourth Amendment, *see Graves*, 821 F.3d at 779 (observing that "no court has devoted much more than a line or two to this issue"), I understand their constitutional analysis as follows: yes (they acknowledge), the common law "usually" forbade warrantless misdemeanor arrests based on hearsay; and yes, the

---

Supreme Court declined to resolve the question there.  *Awadallah,* moreover, concerned the warrantless arrest of a grand jury witness absent any evidence that he had committed a crime, *see id.* at 46, and thus has no bearing here.

Fourth Amendment's reasonableness clause may have incorporated the common law as it existed at ratification.  But the felony-misdemeanor dichotomy that existed at common law simply does not exist anymore: today's legislators and courts use the words "felony" and "misdemeanor" to refer to categories that the common law of 1789 simply would not recognize.

Indeed, the Supreme Court has observed that the felony-misdemeanor distinction at common law "was broad and deep," but that "today the distinction is minor and often arbitrary." *Tennessee v. Garner*, 471 U.S. 1, 14 (1985) ("Many crimes classified as misdemeanors, or nonexistent, at common law are now felonies."); *see also Carroll*, 267 U.S. at 158 ("In England at the common law the difference in punishment between felonies and misdemeanors was very great. Under our present federal statutes, it is much less important and Congress may exercise a relatively wide discretion in classing particular offenses as felonies or misdemeanors.").  Accordingly, no recognizable categories remain to which we might apply the common-law distinction, even if that distinction did theoretically remain good constitutional law.[11]

_____

[11] As the significance of the felony-misdemeanor distinction has dissipated, so too has the significance of the distinction between crimes committed in an officer's presence and outside it.  This latter distinction is, at bottom, one variation of the dichotomy between direct and circumstantial evidence.  Today, we view the consummate "direct" evidence — eye-witness testimony — with greater skepticism than in the past; and at the

F.   **Alternatively, Esters' Arrest Was Justified by Conduct Occurring in the Arresting Officers' Presence**

Even if Esters were correct that the Fourth Amendment prohibits warrantless arrests for misdemeanors committed outside the arresting officers' presence, his motion would still be denied: here, the officers had probable cause to arrest Esters for running a red light in their presence. *See* Def. Mem. Ex. A, at 1:20-1:28 (Esters asks Officer Xylas, on video, why he was being pulled over; Xylas responds that Esters "ran the light on Marcy [Avenue]").  Police officers may effectuate an arrest even for a traffic violation. *See, e.g.*, *Atwater*, 532 U.S. at 354–55; *United States v. Scopo*, 19 F.3d 777, 782 (2d Cir. 1994) ("When an officer observes a traffic offense – however minor – he has probable cause to stop the driver of the vehicle . . . [and] probable cause to arrest him.").

It is of no moment that the traffic violation was not the actual basis for Esters' arrest: the Supreme Court has made

_____

same time, we accord many newer categories of "circumstantial" evidence (like fingerprint and DNA analysis) meaningfully higher confidence. *See Lyons v. Johnson*, 99 F.3d 499, 504 (2d Cir. 1996), *as amended* (Nov. 14, 1996) (characterizing eyewitness testimony as "often highly inaccurate"); *United States v. Glenn*, 312 F.3d 58, 70 (2d Cir. 2002) ("Circumstantial evidence can be as compelling as direct evidence and a conviction can rest solely on circumstantial evidence.").  Indeed, most jurisdictions have done away with the distinction: Sand's pattern jury instructions, for example, provide that the "law makes no distinction between direct and circumstantial evidence" and that "[c]ircumstantial evidence is of no less value than direct evidence."  1 Sand, Modern Federal Jury Instructions, 5-2 (2022).  Given the Supreme Court's repeated admonition that the Fourth Amendment's "ultimate touchstone" is "reasonableness," *e.g.*, *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006), it would make little sense today to categorically bar arrests for misdemeanors that the arresting officers did not see with their own eyes, as long as those arrests were otherwise supported by probable cause.

clear that an officer's "subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause." *Devenpeck*, 543 U.S. at 153 (overturning circuit court's holding that the offense "invoked" by the arresting officers must be "closely related" to the facts actually giving rise to probable cause); *Scott v. United States*, 436 U.S. 128, 138 (1978) ("[T]he fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action."). Likewise, the Second Circuit has held that "an observed traffic violation legitimates a stop even if the detectives do not rely on the traffic violation." *United States v. Dhinsa*, 171 F.3d 721, 725 (2d Cir. 1998). Esters has not disputed that he ran the red light in question. Based on that offense, the officers had probable cause, independent of the I-Card, to arrest him.[12]

## G.   The Inventory Search Procedure Was Valid

Esters does not challenge — at least not at any length — the inventory-search procedure that led to the recovery of the firearm from the glove compartment of the vehicle. Instead, he argues more generally that the inventory search should not have

---

[12] Because I conclude that the arresting officers had probable cause to arrest Esters, his motion to suppress the post-arrest statements is denied.

occurred at all, because the NYPD should not have arrested him and seized the car he was driving.  That argument has been rejected above.  I pause briefly here to note that the manner in which the inventory search was conducted was legally valid.

When law enforcement officials impound a vehicle, they "may search the vehicle and make an inventory of its contents." *United States v. Williams*, 930 F.3d 44, 53 (2d Cir. 2019).  A valid inventory search is not done "to detect crime or to serve criminal prosecutions," but "for quite different reasons: (1) to protect the owner's property while it is in police custody; (2) to protect the police against spurious claims of lost or stolen property; and (3) to protect the police from potential danger." *United States v. Lopez*, 547 F.3d 364, 369 (2d Cir. 2008).

Officers performing an inventory search must act pursuant to "standardized criteria or established routine." *Williams*, 930 F.3d at 53 (quoting *Florida v. Wells*, 495 U.S. 1, 4 (1990)).  "The existence of such a valid procedure may be proven by reference to either written rules and regulations or testimony regarding standard practices." *United States v. Mendez*, 315 F.3d 132, 137 (2d Cir. 2002).  This requirement helps "ensure that inventory searches do not become a ruse for a general rummaging in order to discover incriminating evidence." *Lopez*, 547 F.3d at 371.

Here, the police searched Esters' car pursuant to established procedures set out in the NYPD Patrol Guide.  *See* Gov't Mem. in Opp'n to Mot. to Suppress 16–17, ECF No. 40; *see also* NYPD Patrol Guide, Gov't Mem. Ex. D, at 2, ECF 40-4.  The NYPD Patrol Guide directs officers to search the interior of the vehicle thoroughly, including  the glove compartment.  NYPD Patrol Guide 2.  Officers may "open closed containers as part of an inventory search so long as they act in good faith pursuant to standardized criteria or established routine."  *Mendez*, 315 F.3d at 137.  The Patrol Guide provides that "[a]ny closed container may be opened and its content inventoried" and officers may "force open trunk, glove compartment, etc. only if it can be done with minimal damage."  NYPD Patrol Guide 2.  The video indicates that the officer conducted his search of the vehicle as directed by the NYPD Patrol Guide.  *See* Def. Mem. Ex. C.[13]  The discovery of the gun in the car's glove compartment therefore falls within the scope of a valid inventory search. *See, e.g.*, *United States v. Zimmerman*, 480 F. Supp. 3d 446, 454–55 (E.D.N.Y. 2020).

---

[13] Esters objects that the officers did not "indicate that a search would be conducted of the vehicle, or describe any of the policies or procedures for executing the search."  Def. Mem. 13. But it is not required that Defendant consent to a search of the vehicle at any time before his arrest.  *See Williams*, 930 F.3d at 53.

### III.  Conclusion

For the foregoing reasons, Esters' motion to suppress is denied.

SO ORDERED.

/s/ Eric Komitee
ERIC KOMITEE
United States District Judge


Dated:    November 4, 2022
          Brooklyn, New York